# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:23-cr-00015-MR-WCM-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| ADRIAN DARNELLE CAMP, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Suppress Evidence (the "Motion to Suppress," Doc. 32), which has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

## I.    Relevant Procedural Background

On February 8, 2023, a Bill of Indictment was filed charging Adrian Darnelle Camp ("Defendant") with possessing with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), possessing a firearm after having been convicted of at least one crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1), and possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). Doc. 1.

On February 27, 2023, Defendant made an initial appearance. He requested that counsel be appointed for him, and that request was granted. Also on that day, Defendant was arraigned and entered a plea of not guilty.

1

On December 30, 2023, Defendant filed the Motion to Suppress and a supporting memorandum, by which he moves to suppress evidence seized on May 28, 2022 following a traffic stop, as well as any incriminating statements made by him at that time. Doc. 32.

The Government responded (Doc. 37) and an evidentiary hearing was conducted on March 29, 2024.

This Memorandum now follows.

II.    **Factual Background**

"When material facts that affect the resolution of a motion to suppress… are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir. 1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993)).

### A. The Evidence Presented

At the hearing, the Government called a single witness: Lance Johnson, a deputy with the Rutherford County Sheriff's Office. The Government also submitted, without objection, footage from the body worn cameras of Deputy

2

Johnson and Hunter Hayes, another deputy with the Rutherford County Sheriff's Office, as well as a still photograph from the body worn camera footage of Deputy Hayes.

Additionally, Defendant submitted a redacted copy of the arrest report in conjunction with his briefing. Doc. 32-1.

### B. Factual Findings[1]

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

On May 28, 2022, Deputy Johnson and Deputy Hayes were assigned to patrol the southern portion of Rutherford County.

At some point, another member of the Sheriff's Office advised Deputy Johnson that a confidential informant had indicated that an individual may be transporting drugs through the northern section of the county in a dark sedan. In response, Deputy Johnson and Deputy Hayes relocated to the northern part of Rutherford County.

At approximately 4:30AM, the deputies were parked, side by side, in their respective marked patrol vehicles in the vicinity of Highway 226 and Bostic Sunshine Highway when a dark blue Buick LeSabre drove by their

---

[1] This case involves factual disputes as well as issues of how the applicable legal principles should be applied to the facts. The factual disputes are referenced in this section and the resulting legal analysis of those facts appears in the section that follows.

location. Deputy Johnson began following the vehicle and Deputy Hayes began following Deputy Johnson.

### 1. The Tag Lights

Deputy Johnson testified that the license tag lights on the Buick were not operating and that he activated his emergency lights to make a traffic stop. In response, the driver of the Buick, who was later identified as Defendant, stopped the vehicle.

Defendant contends that there is not sufficient evidence in the record to support the Government's position that the license tag lights on the Buick were not operational.

The Government's showing on this point could have been more robust. Of the two officers involved in the stop, only Deputy Johnson testified during the hearing. In addition, no evidence was presented as to whether law enforcement later confirmed that the license tag lights were not functioning.

However, Deputy Johnson did testify under oath that the license tag lights were not working when he observed the Buick. Further, his body worn camera footage reveals that, immediately upon approaching Defendant's vehicle, Deputy Johnson told Defendant that his tag lights were not working.

The Government also argues that certain images of the Buick in the body worn camera footage of Deputy Johnson and Deputy Hayes confirm that the license tag lights were not working. In that footage, the Buick can be seen

sitting stationary with its lights on; that is, Defendant did not turn off the vehicle's lights during the stop. As for the tag lights specifically, since the rear of the Buick was often illuminated by the headlights of Deputy Johnson's patrol vehicle, which was parked immediately behind the Buick, it is not possible to tell from much of the footage if the tag lights were working. There are, however, short glimpses, such as at the 4:34:31 mark in Deputy Johnson's footage when Deputy Hayes is standing in a position that blocks the light from the headlights of Deputy Johnson's patrol vehicle, where the Buick's license tag appears to be dark.

The undersigned is, therefore, persuaded that the Government has made a sufficient showing to support a factual finding that the license tag lights on Defendant's vehicle were not operational at the time of the stop.

## 2. Consent to Open the Passenger Door

After the Buick came to a stop in response to Deputy Johnson's emergency lights, Deputy Johnson exited his vehicle and approached the Buick on the passenger side. Deputy Johnson testified that, as he did so, Defendant did not shift the vehicle's transmission into park and was "target locked" on him, meaning that Defendant was carefully watching Deputy Johnson as he approached.

Through the closed front passenger window, Deputy Johnson began speaking to Defendant and advised him that neither of his license tag lights

5

was operating. As Deputy Johnson was speaking, Defendant extended his right arm toward the passenger door, holding his driver's license in his right hand.

Deputy Johnson testified that he then asked Defendant if Defendant could roll down the passenger side window, that Defendant advised that the window would not go down, that Deputy Johnson then asked Defendant if he (Deputy Johnson) could open the passenger door, and that Defendant consented.

Defendant challenges this position and argues that there is not sufficient evidence to indicate that Defendant consented for Deputy Johnson to open the door.

Deputy Johnson's body worn camera footage does not begin while he is walking up to the Buick but rather after he has already reached the side of the vehicle.[2] That footage reveals that Deputy Johnson had some trouble communicating easily with Defendant through the closed passenger window; Deputy Johnson had to raise his voice somewhat in order to explain that Defendant's tag lights were out. He then asked Defendant if Defendant could roll the passenger window down. Defendant appeared to understand and immediately reached for the electric window controls on the driver's door.

---

[2] Deputy Johnson testified that the body worn camera he was using that night did not begin recording automatically and that he manually triggered the device to begin recording.

When the passenger window did not roll down, Deputy Johnson asked "can I open the door?" Defendant appeared to say something (which is not audible on the video footage), to which Deputy Johnson responded "huh?" Deputy Johnson testified that Defendant then stated, "open it." This statement is also not clear from Deputy Johnson's body worn camera footage. However, Defendant's body language is consistent with Deputy Johnson's testimony that Defendant consented for Deputy Johnson to open the door. Defendant continued to hold his driver's license in his right hand and, as Deputy Johnson opened the door, reached across the passenger seat toward Deputy Johnson with this item. Also, Defendant expressed no surprise or objection when Deputy Johnson opened the passenger door.

Consequently, the undersigned is also persuaded that the Government has made a sufficient showing that Defendant consented for Deputy Johnson to open the passenger side door. See e.g., United States v. Pentecost, No. 22-4047, 2022 WL 17716899 at *7 (4th Cir. Dec. 15, 2022) (unpubl.) ("[C]onsent to a search need not be express but 'may be inferred from actions as well as words.'") (quoting United States v. Hylton, 349 F.3d 781 (4th Cir. 2003)); United States v. Cohen, 593 Fed.App'x 196, 201 (4th Cir. 2014) (an individual's lack of protest before, during, or after the search may provide additional indicia of consent).

### 3. View of the Interior of the Vehicle

With the passenger side door open, Deputy Johnson received Defendant's driver's license from Defendant and asked Defendant if he had any type of information concerning the Buick. In response, Defendant opened the glove compartment and began to search through its contents.

While Defendant was doing so, Deputy Johnson, who was standing between the passenger side seat and the open passenger side door, shined his flashlight into the front seat area and observed in the center console a small tightly wound or tied piece of plastic wrap that appeared to contain pills. He then asked Defendant to step out of the vehicle and Defendant complied.

Deputy Hayes, who by this time had approached the driver's side of the Buick, stood with Defendant as he exited. The three men then walked toward the front of Deputy Johnson's patrol vehicle, where Defendant was placed in handcuffs.

### 4. Search of Defendant and the Buick

Deputy Johnson told Defendant that he had seen "dope in the car," to which Defendant responded that it must have come from people at "the farm." Deputy Johnson then prepared to pat down Defendant and noticed what appeared to Deputy Johnson to be the straw portion of a glass pipe commonly used to smoke methamphetamine protruding from the top of Defendant's front pants pocket.

Deputy Johnson then patted down Defendant; he removed the pipe from Defendant's pocket and did not find anything else of significance.

Next, Deputy Hayes waited with Defendant while Deputy Johnson returned to the open front passenger door of the Buick. Deputy Johnson removed the small tightly wrapped piece of plastic, which he testified he believed contained illegal narcotics, from the center console and placed it on the front passenger seat. He also removed from the center console a fabric change purse and a small black case. Deputy Johnson testified that he found what he believed to be methamphetamine in a small plastic bag in the fabric change purse.

Afterward, Deputy Johnson returned to the vicinity of his patrol vehicle, where Deputy Hayes was waiting with Defendant. Defendant stated that he was coming back from delivering a leaf blower to someone at "the farm," and asserted that any drugs found in the vehicle were not his.

Defendant was placed in the back of Deputy Johnson's patrol vehicle, and Deputy Hayes and Deputy Johnson searched the Buick.

During that search, Deputy Hayes found a firearm and a large canister of methamphetamine under the driver's seat.

Subsequently, Defendant was transported to the Rutherford County Jail by Deputy Johnson in Deputy Johnson's patrol vehicle. Defendant was not, at

any point during the traffic stop or his subsequent transport, given warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966).

## III. Analysis

Defendant challenges the initial stop and argues that the warrantless search of his vehicle cannot be supported by the plain view exception. Additionally, Defendant contends that any incriminating statements he made after he was placed in handcuffs should be suppressed because he was not advised of his rights under Miranda.

### A. The Search of Defendant and His Vehicle

#### 1. The Initial Stop

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979) (Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977)); see also U.S. v. Johnson, No. 5:04CR65-1-V, 2006 WL 435975, at *4 (W.D.N.C. Feb. 21, 2006) ("[I]t is well-settled that even if there were evidence of a pretextual stop, [an officer's] subjective intentions are irrelevant as long as the traffic stop is consistent with due process.").

Here, the Government argues that Deputy Johnson was authorized to stop the Buick because the vehicle's tag lights were not operational. Based on the factual findings above, the undersigned agrees that Deputy Johnson

lawfully stopped Defendant's vehicle. See U.S. v. Lewis, 466 Fed. Appx. 170, 172 (4th Cir. 2012) ("Because a defective tag light violates N.C. Gen.Stat. § 20–129(d) (2011), we conclude that the district court did not err in finding the initial stop of Lewis' vehicle lawful.").

### 2. The Plain View Exception

The plain view doctrine is an exception to the Fourth Amendment's requirement that law enforcement obtain a warrant before conducting a search. Horton v. California, 496 U.S. 128, 133 (1990). Under this doctrine, "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been ... no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). Three elements must be satisfied before law enforcement may seize an item that is in plain view: (1) "the officer [must] not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; (2) the object's "incriminating character" must be "immediately apparent"; and (3) the officer must have "a lawful right of access to the object itself." Horton, 496 U.S. at 136–37 (internal quotation marks and citations omitted).

### a. The Twisted Piece of Plastic

#### i. Legally Permissible Vantage Point

Defendant contends that when Deputy Johnson initially approached Defendant's vehicle, he opened the passenger door without Defendant's consent and therefore viewed the interior of the vehicle from an improper vantage point.

As discussed above, however, the evidence indicates that Defendant consented for Deputy Johnson to open the passenger side door. Further, based on Deputy Johnson's body worn camera footage, it does not appear that Deputy Johnson leaned into the Buick prior to observing the twisted piece of plastic; rather, Deputy Johnson shined his flashlight into the cabin of the vehicle while standing between the front passenger seat and the open door, and almost immediately requested that Defendant exit the Buick. That is, Deputy Johnson viewed the twisted piece of plastic from a legally permissible vantage point. See e.g., Texas v. Brown, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of privacy…shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.") (internal citation omitted); United States v. Campbell, 549 F.3d 364, 373 (6th Cir. 2008) (officer properly confiscated weapon observed while "standing outside the vehicle" with the passenger door opened during traffic stop); United States v. Bynum, 508 F.3d 1134, 1137 (8th

Cir. 2007) ("Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has a right to be in close proximity to the vehicle."); <u>United States v. Sparks</u>, 291 F.3d 683, 691–92 (10th Cir. 2002) (plain view exception applied where defendant left the driver's side door open, officers arrested defendant at the rear of the vehicle, and then peered through the open door and observed plastic bags that appeared to contain drugs); <u>see also</u> <u>United States v. Jackson</u>, 131 F.3d 1105, 1110 (4th Cir. 1997) (a shift in an officer's position in order to get a better ability to see objects in plain view is constitutionally permissible) (citing <u>Brown</u>, 460 U.S. at 740) (noting that it was constitutionally permissible for an officer during a traffic stop to change his position and bend down at an angle to see what was inside defendant's car)).

## ii.   Incriminating Character of the Item

Additionally, Defendant argues that the incriminating character of the twisted piece of plastic was not immediately apparent.

The Supreme Court has noted that "the use of the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." <u>Brown</u>, 460 U.S. at 741. An officer need not know that certain items are contraband or evidence of a crime; rather, the officer need only establish probable cause "to

13

associate the property with criminal activity." Id. (reaffirming the "the rule, set forth in Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that '[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'").

In that regard, "probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." Brown, 460 U.S. at 742.

Here, Defendant argues that possessing pills generally is not illegal, that people often have pills with them in all sorts of containers (including plastic bags), and that the pills Deputy Johnson observed in the twisted piece of plastic could have been anything, including legal substances. Further, during the hearing, Defendant pointed out that the pills were not field tested and were ultimately determined to be Xanax, and that Deputy Johnson did not ask Defendant if he had a prescription for the pills.

However, Deputy Johnson testified that the particular way these pills were packaged – tightly wrapped in plastic – led him to believe they were

illegal. In that regard, Deputy Johnson stated that, in his experience, material packaged in this way "always" is "some type of illegal narcotic."

The undersigned finds Deputy Johnson's to be credible. See United States v. Heard, No. 5:21-CR-00178-M-1, 2023 WL 4553608, at *4 (E.D.N.C. July 14, 2023) ("The use of a corner baggie reflected a common form of packaging for illicit substances."); Lucas v. U.S., No. 3:10-cv-492-FDW, 3:07-ccr-46-FDW, 2013 WL 5595491, at *9 (W.D.N.C. Oct. 11, 2013) ("Petitioner's statement to Officer Arnold that he had just rolled and smoked a blunt and the fact that the officer observed a plastic baggie in plain view are each events that support the officers' decision to search the vehicle."); see also United States v. Booker, 612 F.3d 596, 601 (7th Cir. 2010) ("The possibility of an innocent explanation does not vitiate properly established probable cause.")).

### b. The Pipe

Defendant argues that Deputy Johnson's observation of the glass pipe did not provide probable cause to search his vehicle. In response, the Government contends that Deputy Johnson's observation of the pipe in plain view, either standing alone or in combination  with Deputy Johnson's observation of the pills in the twisted piece of plastic, justified the search of Defendant's vehicle.

The Fourth Circuit has stated that, when "a police officer lawfully searches a vehicle's recent occupant and finds contraband on his person,"

probable cause to search the vehicle exists. U.S. v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) (citing United States v. Johnson, 383 F.3d 538, 545 (7th Cir. 2004) (an officer's "discovery of a banned substance (drugs) on [the defendant's] person clearly provided [the police officer] with probable cause to search the trunk of the vehicle")); see also United States v. Runner, 43 F.4th 417, 422 (4th Cir.), cert. denied, 143 S. Ct. 532 (2022) ("Despite the increased use of glass pipes to ingest legal substances such as CBD oil, it is still reasonable that a police officer would reach the belief that a glass pipe was evidence of a crime supporting probable cause.").

Here, Deputy Johnson testified that while he was preparing to pat down Defendant, he observed the "straw" portion of a glass pipe sticking out from Defendant's pants pocket, and Deputy Johnson's body camera footage indicates that, almost immediately upon approaching Defendant to pat him down, Deputy Johnson stated that he saw something he believed to be a pipe used to smoke methamphetamine protruding from Defendant's pocket. Further, footage from Deputy Hayes' body camera shows that the glass pipe had, consistent with Deputy Johnson's testimony, cloudy white residue, and Deputy Johnson testified during the hearing that he had observed pipes used to smoke methamphetamine with similar white cloudy residue "hundreds of times."

The undersigned is therefore persuaded that Deputy Johnson' observation of the pipe, in conjunction with his earlier observation of the

twisted piece of plastic in the center console of Defendant's vehicle, provided probable cause to search the Buick. See Wyoming v. Houghton, 526 U.S. 295, 300 (1999) (probable cause to search the vehicle was uncontested where the officer noticed hypodermic syringe in the driver's shirt pocket during a routine traffic stop the driver admitted using it to take drugs); Runner, 43 F.4th at 422 ("cases from this Circuit upholding plain view searches based on pipes and paraphernalia have involved the presence of additional evidence or indicators that contributed to a finding of probable cause."); Cooper v. Worsham, No. 4:07CV00032, 2007 WL 4106456, at *5 (W.D. Va. Nov. 19, 2007) (a police officer had probable cause to search a vehicle "[w]here a driver has been found to have contraband on his person[.]"); see also United States v. Brown, No. 2:21-CR-440, 2023 WL 3300498, at *4 (W.D. Pa. May 8, 2023) (officer properly seized crack pipe prior to patting down defendant where officer saw the pipe in plain view butting out of defendant's pocket) (citing United States v. Focareta, No. 05-227, 2006 WL 2087515, at *11 (W.D. Pa. July 25, 2006) (valid seizure of marijuana and pipe from defendant's hoodie pocket under plain-view exception where officer's flashlight reflected off pipe during valid Terry stop), aff'd, 283 F. App'x 78 (3d Cir. 2008)).

## B. Defendant's Statements to Law Enforcement

"An incriminating statement 'made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under [Miranda]

and the defendant knowingly, intelligently, and voluntarily waives those rights.'" United States v. Ivey, 60 F.4th 99, 112 (4th Cir. 2023), cert. denied, No. 22-7784, 2023 WL 6378334 (Oct. 2, 2023) (internal citations omitted).

### 1. "In Custody"

"If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Berkemer v. McCarty, 468 U.S. 420, 440 (1984). However, "Miranda warnings are not required when a person is questioned during a routine traffic stop or stop pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." United States v. Leshuk, 65 F.3d 1105, 1108 (4th Cir. 1995) (citing Berkemer, 468 U.S. at 437-421).

"When deciding whether a defendant not under formal arrest was in custody—and thus if the Miranda requirements apply—a court asks whether, 'under the totality of the circumstances, 'a suspect's freedom of action [was] curtailed to a degree associated with formal arrest.'" United States v. Hashime, 734 F.3d 278, 282 (4th Cir. 2013) (internal citations omitted). The Fourth Circuit has explained that:

> This inquiry is an objective one, and asks whether "'a reasonable man in the suspect's position would have understood his situation to be one of custody." United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007). In other words, the court considers whether "a

reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." United States v. Jamison, 509 F.3d 623, 628 (4th Cir. 2007).

Facts relevant to the custodial inquiry include, but are not limited to, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." United States v. Day, 591 F.3d 679, 696 (4th Cir. 2010). Also pertinent are the suspect's isolation and separation from family, see United States v. Griffin, 7 F.3d 1512, 1519 (10th Cir.1993), and physical restrictions, United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir.1990).

Id. at 282–83 (internal citations omitted).

In this case, neither Deputy Johnson nor Deputy Hayes read Defendant his Miranda warnings at any time during the traffic stop or while he was being transported to the Rutherford County Jail. The initial issue, therefore, is determining when Defendant was taken into "custody," such that Miranda warnings were required before he was questioned.

Courts have found that an officer may temporarily handcuff a suspect during a traffic stop, put the suspect in a patrol car, and/or run a background check for the officer's safety, United States v. Perry, 92 F.4th 500, 511-512 (4th Cir. 2024), and that this temporary detention does not necessarily amount to "being in custody" for Miranda purposes. See Leshuk, 65 F.3d at 1109-1110 ("Instead of being distinguished by the absence of any restriction of liberty,

19

Terry stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion. From these standards, we have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes") (citations omitted); United States v. Donaldson-Pinilla, 292 Fed.Appx. 217, 218–20 (4th Cir. 2008) (holding that an officer may temporarily handcuff a suspect during a traffic stop for the officer's safety, without triggering a Miranda requirement, as long as the restriction lasts only long enough to verify suspicions of illegal activity).

Here, Defendant was stopped in the early morning hours in a rural setting by two armed officers in separate patrol vehicles and was placed in handcuffs immediately upon exiting the Buick. Once handcuffed, Defendant complained multiple times that the handcuffs were painful.

Deputy Johnson then instructed Defendant to lean against the front of Deputy Johnson's patrol vehicle and told Defendant that he had "seen the bag of dope in the car." Shortly thereafter, Deputy Johnson shined his light on Defendant's pocket, and asked Defendant, "Is that a meth pipe right there?" Defendant continued to complain about the handcuffs, stating that they were hurting his shoulder due to a past shoulder surgery. In response, Deputy Johnson and Deputy Hayes both told Defendant that he had to remain in the

20

handcuffs. Defendant asked if he could be "double cuffed," and Deputy Johnson responded, "we're not taking the handcuffs off."

Thereafter, Deputy Johnson returned to the Buick, while Deputy Hayes conversed with Defendant. During that conversation, Defendant was allowed to stand outside of Deputy Johnson's patrol vehicle and Deputy Hayes did not place his hands on Defendant.

The tenor of the situation began to change at approximately 4:32:21 as reflected on Deputy Hayes' body worn camera footage. At that point, Deputy Johnson asked that Defendant be placed in the back of a patrol car, and informed Deputy Hayes that Defendant's handcuffs would need to be "double locked." Deputy Johnson testified during the hearing that he placed Defendant in the back of his patrol vehicle because Defendant "was essentially under arrest."

Consequently, Defendant was "in custody" for purposes of <u>Miranda</u> at approximately 4:32:21.

## 2. Interrogation

The next issue is whether Defendant was subjected to any "interrogation" after he was in custody.

 Questioning may constitute "interrogation" when "police should know [it is] reasonably likely to elicit an incriminating response." <u>United States v. Johnson</u>, 734 F.3d 270, 276 (4th Cir. 2013) (citing <u>Rhode Island v. Innis</u>, 446

U.S. 291, 299-301 (1980)). "In determining whether a suspect was subject to interrogation, the focus is on the perception of the suspect not the police." United States v. Bennett, No. 2:15-cr-20-BO, 2016 WL 1259905, at *1 (citing Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).

Here, the deputies' interactions with Defendant can be divided into three segments.[3]

### a. Before Defendant Entered Deputy Johnson's Patrol Vehicle

After Defendant was placed in custody but before Defendant was sitting fully in Deputy Johnson's patrol vehicle, Deputy Johnson asked certain questions and made certain statements to Defendant. While many of these communications appear to have been made in response to Defendant's own statements, including Defendant's assertion that other people had put contraband in his car, they were also intended to illicit incriminating responses. See e.g., Deputy Johnson's body worn camera footage at 4:33:44 ("What's at the farm?); 4:35:53 ("I mean, right now, it's in the car...and you're

---

[3] The evidence presented in connection with the Motion to Suppress did not contain a full listing of all statements allegedly made by Defendant, whether as captured on the body worn camera footage of the deputies and/or as recalled by Deputy Johnson or Deputy Hayes. In addition, the Government has not identified the statements it contends were inculpatory and that it intends to use against Defendant. Similarly, Defendant has not identified specific statements that he contends should be suppressed. Consequently, this Memorandum focuses on the questions and statements directed toward Defendant and does not analyze each statement or response made by Defendant.

the only one in the car, that's why you're in handcuffs, right?"); 4:36:13 ("If somebody did leave something in there, now's the time to let me know."); 4:36:24 ("Did they put anything else in there?").[4]

### b. Before Transport

After the firearm and the canister were located in the Buick, Deputy Johnson returned to his patrol vehicle, opened the door closest to where Defendant was sitting and stated: "Alright man, you see it. I'm just letting you know." He also said that he (Deputy Johnson) would talk to Defendant in a "little bit." He then closed the door continued searching the Buick with Deputy Hayes.

Approximately 30 seconds later, Deputy Johnson again came back to his patrol vehicle. Based on Deputy Johnson's body worn camera footage, it appears that Defendant tried to speak with Deputy Johnson from the back seat. Deputy Johnson asked Defendant what he was saying, and then asked Defendant what he meant. See Deputy Johnson's body worn camera footage at 4:42:00. As Defendant continued trying to speak with Deputy Johnson, Deputy Johnson told Defendant: "You have rights, okay, and one of 'em is to remain silent, and I'm gonna talk to you later if you want to...."

---

[4] Defendant made various responses to these communications. See e.g., Deputy Johnson's body worn camera footage at 4:35:50-4:36:47) (including "If you've seen it, you know where it come from" (referring to the "dope" Deputy Johnson stated he had seen in Defendant's car) and that "they put that in there.").

23

The undersigned finds that these statements and questions directed to Defendant while he was seated in Deputy Johnson's patrol vehicle also were reasonably likely to elicit an incriminating response.

### c. During Transport

Deputy Johnson began transporting Defendant to the Rutherford County Jail at approximately 4:55:43. During the trip, he initially engaged in small talk with Defendant.

Later, however, Deputy Johnson asked Defendant if he was "on probation or parole or anything?" (4:56:43), and then proceeded to ask questions about "the farm" and how contraband came to be found under the driver's seat of the Buick. <u>See</u> <u>e.g.</u> Deputy Johnson's body worn camera footage at 4:57:12 ("What did they do exactly?"); 4:58:06 ("So they shoved it up underneath there, you think?"); 4:58:08 ("So, you're thinking they shoved it up underneath there?").[5]

The undersigned finds that these questions were also reasonably likely to illicit an incriminating response.[6]

---

[5] Defendant's responses to these questions are generally unintelligible from the footage.

[6] It appears that Deputy Johnson was aware of the need for Defendant to receive <u>Miranda</u> warnings. For example, at approximately 5:03:40, Deputy Johnson told Defendant it was difficult to continue to talk while in the patrol car "plus, you know, I gotta read you some stuff." Defendant responded that he "knew his <u>Miranda</u> rights," and Deputy Johnson stated, "I have to read them to you, it's the law." Even after this exchange, however, Deputy Johnson continued to engage with Defendant.

Accordingly, the undersigned will recommend that any statements made by Defendant after he was placed in custody, and that the Government contends are incriminating and intends to use against Defendant, be suppressed.

## Recommendation

Based on the foregoing, the undersigned respectfully **RECOMMENDS**

(1) That Defendant's Motion to Suppress (Doc. 32) be **GRANTED IN PART**, and that any incriminating statements made by Defendant after his custodial arrest and that the Government intends to use against Defendant be suppressed.

(2) That, in all other respects, Defendant's Motion to Suppress (Doc. 32) be **DENIED**.

Signed: April 24, 2024

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).